

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | **WD78202** |
| Respondent, | ) | |
| v. | ) | **OPINION FILED:** |
| | ) | |
| **HARRY J. WILLIAM,** | ) | **November 8, 2016** |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri
Honorable Shane Terril Alexander, Judge**

**Before Division One:  Thomas H. Newton, P.J.,
Cynthia L. Martin, and Edward R. Ardini, Jr., JJ.**

Mr. Harry J. William appeals his conviction in Clay County Circuit Court following a jury trial for first-degree statutory rape, § 566.032,[1] for which he was sentenced to eighteen years in the Department of Corrections.  He argues that the circuit court abused its discretion in denying his request for an interpreter and in denying his motion to dismiss when an interpreter could not be found due to the rarity of his native language.  Comparing the lack of an interpreter to other structural trial defects, such as the absence of counsel or a biased court, he claims that his constitutional rights of due process, equal protection, meaningful participation in trial, and counsel were violated. We affirm.

---

[1] Statutory references are to RSMo (2000), as supplemented through March 2012, unless otherwise indicated.

The State charged Mr. William with first-degree statutory rape in March 2012 for an incident that allegedly occurred in Clay County, Missouri, involving a child younger than age 14 between May and June 2010.[2] Mr. William grew up on a small Micronesian island where fewer than 2,000 people, including Mr. William, speak Pingelapese, an oral language that is neither taught in schools nor used to conduct official government business.[3] Mr. William filed a motion seeking an interpreter for the Pingelapese language in December 2011. The court granted the motion, and a Micronesian interpreter was appointed and served from December 2011 until April 2013. This individual was sworn in and was present during four pre-trial hearings in 2012. A nun, Sister Agnes, who speaks Pohnpeian, a Micronesian language with some Pingelapese overlaps, was sworn in to interpret for Mr. William during four hearings in early 2013. In April 2013, Mr. William filed an application for the appointment of a male defense interpreter who could speak Pingelapese. The court granted the motion.

Between March 2012, when Mr. William was arraigned, and September 2014, when his trial began, the court conducted thirty-three hearings, during just eight of which an interpreter was sworn in.[4] Mr. William does not contend that his rights were violated due to the absence of an interpreter during these pre-trial hearings at which he was always represented by counsel. During only one of these hearings—the March 2012 arraignment—Mr. William stated on the record that he could not understand what the court had said. During a hearing in October 2012 at which a motion for continuance

---

[2] We view the facts in the light most favorable to the verdict. *State v. Buckler*, 350 S.W.3d 848, 850 (Mo. App. W.D. 2011).

[3] The official and common language of Micronesia is English.

[4] Appendix A contains a complete list of the hearings, noting at which ones an interpreter appeared and what occurred.

was addressed, Mr. William stated that he was able to understand what the court and counsel had been talking about.  During an April 2013 hearing that similarly concerned a motion for continuance, Mr. William agreed that he was able to communicate with counsel in English and could understand what was being said during that hearing.

The State filed a motion in August 2013 for a qualified court interpreter or the waiver of a qualified interpreter.  Mr. William refused to waive the appointment of a qualified interpreter for trial and expressed via counsel his dissatisfaction with Sister Agnes who spoke a dialect he claimed he did not always understand and was not trained to interpret during court proceedings.  The court granted his request for a continuance and removed the case from the trial docket so efforts to locate a Pingelapese interpreter could continue.

The State filed a motion in March 2014 regarding the use of an interpreter, seeking to make a record given the parties' inability to locate a suitable interpreter and the possiblity that Mr. William had a sufficient grasp of the English language that an interpreter might not be required.  During a hearing on the motion, the police detective who questioned Mr. William in 2011 as part of the investigation, Mr. William's brother, who is the alleged victim's stepfather, and Mr. William's sister-in-law, the alleged victim's mother, testified for the State.

Detective Matt Brantner testified that he spoke with Mr. William for about an hour after giving him Miranda warnings.  Mr. William had written the word "yes" on a document that asked if he could read and write English.  While the detective acknowledged that he sometimes had difficulty understanding Mr. William due to his heavy accent and had to repeat certain words in English or find other words for Mr.

3

William to understand what he was saying, he agreed that Mr. William did not "have any trouble understanding English or speaking English." Mr. Mike William testified that he did not grow up with his brother, who had remained on Pingelap, while he was raised on Pohnpei. Mr. Mike William indicated, however, that Pingelapese was the language spoken in the home or among friends, and that English was spoken and taught in the schools, particularly on Guam, where the Defendant had spent at least one year while growing up. He also testified that the Defendant had come to the United States in 1996, or eighteen years earlier.[5] Ms. Cecelia William testified that she had met the Defendant in 2005 when both of them were working in a nursing home as certified nursing assistants.[6] According to Ms. William, who does not speak Pingelapese, the Defendant spoke English with her and her children, including the victim, and at work. She agreed that Mr. William could speak English and that he could communicate with her. The State introduced the police interview video, emphasizing that it was conducted entirely in English.

Addressing the State's motion in April 2014, the court opined that Mr. William's command of the English language was likely sufficient for trial, but indicated a

---

[5] Mr. William was born in June 1978, which means that he was about 18 years old when he came to the United States. Without any evidence indicating that he had lived anywhere else between 1996 and when this hearing took place in March 2014, we can infer that he had spent approximately half his life in Micronesia and half in the United States.

[6] While the State made no effort to show what qualifications Mr. William would need to be employed in a nursing home as a certified nursing assistant, we would note that section 198.082 imposes some training requirements on such individuals, including a formal program teaching "basic nursing skills, clinical practice, resident safety and rights, the social and psychological problems of residents, and the methods of handling and caring for mentally confused residents such as those with Alzheimer's disease and related disorders." § 198.082.3(1). Under the Missouri Code of State Regulations, nursing assistants are required to complete a basic course consisting of 75 hours of classroom training, 100 hours of on-the-job training, and a final examination. MO. CODE REGS. ANN., tit. 19, § 30.84.010(1)(A) (2001).

4

willingness to give him more time to locate a Pingelapese interpreter.[7]  Mr. William's counsel stated during this hearing that the responses given during the police interview were monosyllabic and argued that "[t]here is a difference between being able to understand a little bit of English that's going on around him and being able to articulate his own thoughts in that second language."  Eight pre-trial hearings occurred after this one, and four of them were devoted to a discussion about whether an interpreter could be found for Mr. William's trial.  During a May 2014 pre-trial hearing, defense counsel conceded that it would be impossible to locate a Pingelapese interpreter; he indicated to the circuit court that he had agreed with the State that the case should be set for trial and placed back on the schedule.

On the first day of trial (September 22, 2014), Mr. William made a motion to dismiss the charge "based upon the interpeter problem."  He claimed that his

---

[7] In this regard, the court stated,

> Well, as I indicated in chambers, after the hearing on the State's motion the Court has been leaning strongly toward granting it out of a belief that there simply wasn't the possibility of obtaining a certified interpreter, and I think everyone has perhaps reached that conclusion.
>
> It's the Court's opinion that if all else fails, the defendant's command of English is, would be sufficient in order for the jury trial to take place.  That said, I think that the defendant should be granted the opportunity to investigate the possibility of finding a qualified Pingelapese interpreter, the challenge always being here that this is a very rare language, especially in this area of the country, that this is a language that is only spoken, and there just aren't, for lack of a better term, there just aren't that many people around here that speak it.
>
> I think everyone involved in the case has spent a lot of time searching and trying to find a certified interpreter.  I want to say I sincerely appreciate the efforts expended by the State and by the defense to find one.  At some point in time we just have to accept the fact that there is not one and proceed.
>
> As I said, though, now that the defendant is dropping his objection to anything but an officially certified Pingelapese interpreter and is asking for time to instead try to find someone qualified to act as an interpreter.  I think that is a reasonable request.  Out of an abundance of caution we should allow the defendant to explore that one last avenue.

constitutional rights of due process and equal protection, to confront witnesses and meaningfully participate, and to counsel would be violated if the charge were not dismissed. Defense counsel conceded that Mr. William could "get by" as a non-English speaker "for everyday uses," but further stated, "I do not believe he adequately understands the legal ins and outs of his predicament. I'm concerned also that under the unique circumstances, even judicial inquiry into this defendant's understanding cannot remedy the situation."

The trial judge, who had presided over every hearing since the charges had been filed and had had the opportunity to observe the Defendant, ruled that Mr. William's understanding of English was "sufficient for Constitutional purposes for him to be able to understand the proceedings against him and participate in his own defense such that no interpreter is necessary in order to protect his constitutional rights." Thereafter, when discussing plea offers that had been made and not accepted, defense counsel pointed out that the State had offered a non-sex misdemeanor with credit for time served, which Mr. William had not accepted. Asked by the court about the plea offers, Mr. William agreed that he had rejected them and had been given sufficient time to consider them.

During the colloquy about Mr. William's decision not to testify at trial, Mr. William indicated that he had not had enough time to think about whether he would testify, but when questioned further and informed by the court that the jury would be instructed that no adverse inference could be drawn from his silence, he indicated that he did not want to testify, stating, "Well, I think I'm going to not testify."

6

Mr. William filed a motion for judgment of acquittal at the close of the State's evidence and, in arguing it, renewed his objection to the lack of an interpreter. The court denied the motion. Mr. William did not present any evidence. A jury convicted Mr. William of first-degree statutory rape and recommended an eighteen-year sentence, which the court imposed after denying his motion for judgment of acquittal or new trial.

Regarding that motion, defense counsel argued again that his client's rights were violated because he was a non-English speaker.[8] The court reiterated that it remained convinced that Mr. William's grasp of the English language was sufficient for the trial to proceed and that he had understood the offers but rejected them.

After sentencing, the court questioned Mr. William about the representation his attorney had provided and whether he understood his post-trial rights. Among other matters, Mr. William stated during this colloquy, "[W]hen I first got here I asked for a speedy trial, but as we stuck on that translator, [defense counsel] came back and he said, well, we cannot do that because we cannot locate a translator." When asked if he had been satisfed with the search for an interpreter, Mr. William stated, "I'm okay with

---

[8] In this regard, counsel stated,

> I would emphasize that the problem with the language, I believe, created an inhibition on the part of my client to testify in his own behalf, and that's understandable. While a person may understand enough English to have conversation in private with his attorney where things can be repeated and rephrased and with a lot of time, that's a much different setting than one in which he is going in front of an audience but, even more critically, being cross examined by people who are professionally trained to question others in that context. And so I think that language problem is a barrier in particular when it came to his decision to not testify on his own behalf.
>
> The other thing is perhaps as an evidence that he may not have understood the situation, we went on the record and indicated what the last plea offer was, and it was to a misdemeanor with sexual language taken out of it and an offer of credit for time served, which he had already far exceeded the maximum range of sentence on an A misdemeanor, and he refused to accept that offer. I'm not sure that he understood it.

it, but at the end it's not, it's not fair to me to sit in the courtroom when I don't understand what's going on." He also spontaneously asked if he could appeal the case. Mr. William timely filed this appeal.

**Legal Analysis**

Mr. William raises a single point on appeal, that is, whether the circuit court abused its discretion and violated his constitutional rights in denying his motions for a Pingelapese interpreter and overruling his motion to dismiss when an interpreter could not be found. Because the record does not support his claim that the circuit court denied his request for an interpreter, we will address only whether the court erred in overruling his motion to dismiss, an issue preserved before and during trial and in Mr. William's motion for judgment of acquittal or in the alternative for new trial.[9]

A circuit court's denial of a motion for new trial is reviewed for abuse of discretion, and we will reverse only where "its ruling is clearly against the logic of the existing circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Rios*, 314 S.W.3d 414, 418 (Mo. App. W.D. 2010). We review the denial of a motion for judgment of acquittal by viewing "the evidence in the light most favorable to the verdict and disregard[ing] all contrary evidence and inferences." *State v. Buckler*, 350 S.W.3d 848, 850 (Mo. App. W.D. 2011). To the extent that the appellant argues "that his conviction was barred by law, the legal issue is reviewed de novo." *Id.*

---

[9] As indicated above, the court actually twice granted Mr. William's applications for the appointment of a Pingelapese interpreter.

8

The Legislature adopted section 476.803 in 2004; it states, "[t]he courts shall appoint qualified interpreters and translators in all legal proceedings in which the non-English speaking person is a party or a witness." § 476.803.1. Section 476.800(3) defines a "non-English speaking person," in part, as "any person involved in a legal proceeding who cannot readily speak or understand the English language."[10] Before these provisions were enacted, the only statutory reference to interpreters was in section 476.060, which remains in effect. Dating back at least to 1825, this section states, "The courts may, from time to time, appoint interpreters and translators to interpret the testimony of witnesses, and to translate any writing necessary to be translated in such court, or any cause therein." R.S. 1825 p. 274 § 17. In cases applying section 476.060, our trial courts have been accorded discretion to decide whether an interpreter was needed. *See, e.g., State v. Aguelera*, 33 S.W.2d 901, 904 (Mo. 1930); *State v. McGinnis*, 59 S.W. 83, 86-87 (Mo. 1900); *see also Stanley v. State*, No. ED102812, slip op. at 6 (Mo. App. E.D. May 24, 2016) (observing that a language barrier denies a defendant "the right to be present at his own trial, which right stems from the constitutional commands of due process and from the Sixth Amendment's guarantees of the right to confront and cross-examine adverse witnesses," court finds that record refuted defendant's post-conviction, ineffective-assistance "claim that the motion court's determination that he was capable of communicating with his lawyer and understanding the proceedings against him was clearly arbitrary, unwarranted, or erroneous").

---

[10] The parties have not cited and we have been unable to locate any Missouri cases applying these sections.

9

We believe that because the definition of a non-English speaking person requires a determination that the individual "cannot readily speak or understand the English language," the circuit court has discretion to decide at the outset whether the individual is a non-English speaking person and thus whether a qualified interpreter "shall" be appointed in a particular legal proceeding. §§ 476.800(3), 476.803.1. Mr. William suggests that the circuit court overruled his motion because an interpreter could not be found, and while the court mentioned this difficulty, it specifically ruled that Mr. William's ability to speak and understand the English language was sufficient for constitutional purposes and that no interpreter was necessary to protect his rights.[11] Accordingly, we will address this issue and analyze it as a matter of circuit court discretion.

Mr. William proposes a number of factors that should be considered in determining whether a non-English speaking defendant can "readily speak or understand the English language" under section 476.800. Nowhere in the record does it show that Mr. William asked the circuit court to adopt and apply these factors or that he introduced evidence to demonstrate his inability to readily speak and understand English on the basis of these factors, so we could simply decline to address them on the basis of waiver. Even if we were to address the merits as a legal issue requiring *de novo* review, we would decline the invitation because Mr. William's factors go far beyond the standards applied to any other defendant in a criminal proceeding. Among

---

[11] The parties have not cited any case law, nor has this Court found any, addressing the effect on a criminal defendant's rights when a court cannot appoint an interpreter as requested, and one is needed due to the defendant's inability to speak English, because an interpreter speaking an extremely rare dialect cannot be located. See cases collected at Jean F. Rydstrom, *Right of Accused to Have Evidence or Court Proceedings Interpreted*, 36 A.L.R.3d 276 (1971, as updated by cumulative supplement). Because this was not the basis for the court's decision and the parties have not argued it, we do not further consider the matter.

10

other matters, Mr. William asks that court-certified interpreter requirements be applied to non-English speaking defendants. These requirements include a grasp of a language other than English sufficient to accurately translate proceedings; a "[n]ative or native-like proficiency in all working languages"; "[k]nowledge and use of a broad range of vocabulary, including legal terminology, subject-specific terminology, and slang"; and a "[k]nowledge and use of cultural nuances, regional variations, idiomatic expressions, and colloquialisms in all working languages."[12] This level of rigor goes well beyond the statutory requirement of readily understanding and speaking the English language, so we decline to adopt these factors and cannot conclude that the circuit court erred in not applying them.

As well, courts in other jurisdictions have more persuasively applied the test for mental capacity in determining whether a non-English speaking person was unable to participate in his or her defense. *See, e.g., Murillo v. State*, 163 P.3d 238, 241 (Idaho Ct. App. 2007) (stating that test used to decide whether a defendant has the mental capacity to stand trial is "whether the defendant has sufficient present ability to consult with his or her own lawyer with a reasonable degree of rational understanding and whether the defendant has a rational, as well as factual, understanding of the proceedings against him or her," and applying test in the context of a non-English speaking person) (citing *U.S. v. Cirrincione*, 780 F.2d 620, 633-34 (7th Cir. 1985) (holding that due process requires that what is told to defendant is comprehensible, translation's accuracy and scope is not subject to grave doubt, nature of proceeding is explained in a manner that ensures full comprehension, or credible claim of incapacity

---

[12] During oral argument, counsel stated that a non-English speaking defendant should be able to pass the same certification exam required of court-certified interpreters.

to understand due to language difficulty is not made); *U.S. ex rel. Negrón v. N.Y.*, 434 F.2d 386, 389 (2d Cir. 1970) (in criminal case involving Spanish-speaking defendant, court discusses essence of the right to be present as defendant having a reasonable degree of rational understanding and the ability to consult with counsel); *Gonzalez v. Phillips*, 195 F. Supp. 2d 893, 902-03 (E.D. Mich. 2001) (in ruling counsel ineffective for failing to request an interpreter for his client, court finds "little difference between trying a mentally, incompetent defendant and trying a defendant who cannot understand the proceedings against him because he does not understand the language")).  We can thus distill the right accorded a defendant with certain limitations, including language, as the ability to consult with counsel and to understand the proceedings against him or her.

The other factors Mr. William proposes that circuit courts consider when deciding whether a defendant can readily speak and understand English include the complexity of the proceedings, issues, and testimony.  His main focus is on the circumstances in this case, which he characterizes as a "he-said/she-said case," where the weight of his "testimony would hinge upon every word he said.  That adds to the complexity of his testimony, the importance of his ability to understand questions asked of him during testimony, and his ability to answer in the language in which he is best able to express himself."  He also suggests that even the concept of statutory rape "requires legal knowledge to understand."  Mr. William does not contend that the circuit court did not fully consider these issues in making its decision about his English-speaking ability, but he argues that applying them leads to the conclusion that he "did not understand enough court-related English to be able to effectively participate in his

defense." We disagree. We are unaware of any case law requiring that, for due process purposes, a criminal defendant must understand "court-related English." Nor has Mr. William cited any.

Reviewing the circuit court's discretionary determination that Mr. William would not be denied his constitutional rights without the assistance of an interpreter at trial, we can find no court error rising to a level that shocks the sense of justice or indicates a lack of careful consideration. Mr. William had been in this country for some eighteen years, or half of his life, when he was tried, and three witnesses indicated that he spoke English on the job and communicated in English with them. Defense counsel argued that, with just one exception—evidently when explaining the plea offers to Mr. William—his client was able to communicate with counsel in English, albeit at a slower pace than trial. Mr. William has not argued that he did not understand the charges or the proceedings, and, in fact, when he spoke at any length, particularly during sentencing, was clearly able to articulate his thoughts and concerns in English. The circuit court, which had Mr. William before it through at least thirty-three pre-trial hearings and took evidence on the question of his grasp of the English language, was in the best position to form an opinion on whether, to the extent of being able to communicate with counsel and understand the proceedings against him, he could readily speak and understand English.

Mr. William also argues that the lack of an interpreter constituted a structural error under *Arizona v. Fulminante*, 499 U.S. 279, 311 (1991), and is not amenable to a harmless-error analysis. No court has apparently yet stated unequivocally that proceeding to trial without an interpreter constitutes a structural error, nor must we do

13

so, given our determination that the trial court did not abuse its discretion in proceeding to trial after ruling that Mr. William readily spoke and understood English. Mr. William further contends that he was prejudiced by the language barrier in that he chose not to testify because, as his counsel stated, he was not confident of his ability to fully and accurately express himself in English in reponse to questions.[13] He cites no case law that supports his claim that his choice not to testify in his own defense for language reasons compromised his constitutional rights. With any number of reasons that an individual might not wish to testify, including a fear of public speaking, a speech defect, or a significant stutter, we are unconvinced that an accent or the need for extra time to formulate a response are such liabilities that a due process violation necessarily results from not accommodating them. This point is denied.

### Conclusion

Because the circuit court did not abuse its discretion in ruling that Mr. William readily spoke and understood the English language and thus the appointment of an interpreter was not required to protect his constitutional rights, we affirm.

/s/THOMAS H. NEWTON
Thomas H. Newton, Judge

Martin, and Ardini, JJ. concur.

---

[13] Mr. William did not address this issue before the trial court when engaging in a thorough colloquy about his decision to forego testifying in his own defense.

**Appendix A**

No interpreter; PD indicates Pingelapese interpreter needed; re-arraignment
scheduled when defendant indicates in response to court query that he does not
understand what court is saying
March 22, 2012

Micronesian interpreter sworn in; continuances granted
April 5, 2012
April 19, 2012
May 24, 2012
June 28, 2012

No interpreter; defense claims unneeded for granting of continuance; defendant
indicates ability to understand what is being said (Tr. 16-17)
October 5, 2012

Sister Agnes, Pohnpeian interpreter, sworn in; motions in limine heard involving
prior bad acts of defendant and victim, and Rape Shield law
January 9, 2013
February 1, 2013
April 5, 2013

No interpreter; motion filed for Pingelapese interpreter at trial; while Pohnpeian is
related language, not close enough for defendant to understand; defendant agrees that
he knows enough English to communicate with counsel and understood what
occurred during hearing (Tr. 57-58)
April 18, 2013

Pohnpeian interpreter sworn in; defendant indicates he can understand interpreter,
Sister Agnes; ready to set case for trial
May 2, 2013

No interpreter; motions for continuance; Sister no longer available
June 7, 2013
July 18, 2013

No interpreter; State asks for qualified court interpreter for trial and defendant
refuses to waive; defendant claims Pohnpeian is not adequate and he cannot always
understand Sister Agnes; defendant has been in custody for two years; court
acknowledges problems getting qualified interpreter (Tr. 72)
August 14, 2013

No interpreter; State and defense still looking; continuances granted
September 12, 2013
October 3, 2013

1

October 24, 2013
November 14, 2013

No interpreter; acknowledgement that certified interpreter probably unavailable; Pingelapese is a rare dialect and not a written language; still looking for interpreter; continuance granted
December 12, 2013

No interpreter; State and defense unsuccessful in locating one; continuances granted
January 16, 2014
January 30, 2014
February 20, 2014
March 6, 2014

No interpreter; State motion as to need for interpreter heard; Detective who spoke with defendant, defendant's brother, and victim's mother testify as to defendant's apparent use and understanding of English
March 20, 2014

No interpreter; defendant drops request for court-certified interpreter of Pingelapese, but seeks funding to locate and compensate qualified and competent interpreter; court finds defendant's understanding of English is probably good enough for trial but allows more time to find Pingelapese interpreter
March 27, 2014

No interpreter; still looking for one; court rules on various motions and agrees to continue trial
April 3, 2014

No interpreter; defense has a few leads; case continued
April 10, 2014
April 24, 2014

No interpreter; lack of success locating one, parties agree to get case back on trial schedule (Tr. 142)
May 1, 2014

No interpreter; no talk about finding one; new trial dates
May 15, 2014
May 16, 2014
August 21, 2014

No interpreter; no talk about finding one; States seeks continuance; no objection
September 2, 2014

2

No interpreter; trial begins; defendant files motion to dismiss due to lack of interpreter; court rules that interpreter not needed (Tr. 163)
September 22, 2014

No interpreter; court denies motion for new trial; defendant sentenced
December 5, 2014